1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11 CENTRAL SIERRA ENVIRONMENTAL
RESOURCE CENTER, et al.,

12

                   Plaintiffs,                             Civ. No. S-10-2172 KJM-AC

13

     vs.

14

UNITED STATES FOREST SERVICE, et al.,

15

                   Defendants,

16

     and

17

18 CALIFORNIA ASSOCIATION OF
4 WHEEL DRIVE CLUBS, et al.,

19

                   Defendant-Intervenors.         <u>ORDER</u>

20

_____/

21

22           Plaintiffs are three nonprofit environmental groups who allege that defendants U.S.

23 Forest Service ("Forest Service"), Susan Skalski and Randy Moore violated the National Environmental

24 Protection Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, the Administrative Procedures Act ("APA"), 5

25 U.S.C. § 500, *et seq.*, the Forest Service's Travel Management Rule ("TMR"), 36 C.F.R. § 212.55, and

26 Executive Orders 11644 and 11989, through the Forest Service's adoption of a Record of Decision

27 ("ROD") that approved the Stanislaus National Forest Motorized Travel Management Environmental

28 Impact Statement ("EIS").  Plaintiffs seek declaratory and injunctive relief.  (Compl., ECF 1.)  On

1

January 7, 2011, the court granted the motion to intervene on behalf of the Forest Service by several

motorized vehicle recreation groups.  (ECF 23.)  On June 8, 2011, the court heard oral argument on the

parties' cross-motions for summary judgment.   The court heard additional oral argument on November

27, 2012.  For the reasons set forth below, the court grants plaintiffs' motion in part, and denies

defendants' and defendant-intervenors' motion, also in part.

I.     Background

    A.  The Stanislaus National Forest

        The Stanislaus National Forest ("the Stanislaus") is part of the U.S. National Forest

System (NFS) and is located in the Sierra Nevada mountain range of California between Lake Tahoe

and Yosemite National Park.  (Statement of Undisputed Facts, ECF 32-2 ¶ 2; AR000740.[1])  It includes

opportunities for recreational activities, including hiking, camping and backpacking.  (AR000739.)  The

Stanislaus also provides habitat for numerous species of plants and animals, including several threatened

or endangered species.  (ECF 32-2 ¶ 11.)  Motorized visitors frequently visit the Stanislaus, including

drivers of Off Highway Vehicles ("OHVs").  OHVs are vehicles "designed for or capable of cross-

country travel on or immediately over land, water, sand, snow, ice, marsh, swampland, or other natural

terrain."  36 C.F.R. § 212.1.  Plaintiffs allege that the use of OHVs and other motor vehicles in the

Stanislaus may endanger non-motorized visitors such as bird watchers, hikers and campers.  (ECF 1

¶ 26.)  Unauthorized motor vehicle use may also harm the natural characteristics and wildlife of the

Stanislaus.  (ECF 32-2 ¶ 6.)

        Visitors access the Stanislaus through a system of roads and trails, which are managed by

the U.S. Forest Service as part of the National Forest Transportation System ("NFTS").  (*Id.* ¶ 4.)  The

NFTS includes roads and trails that the Forest Service has designated for motorized use, as well as those

designated for non-motorized use only.  (*Id.*)  In addition to the official NFTS roads and trails, there are

many "unauthorized" roads and trails in the Stanislaus created by visitors driving motorized vehicles off

trail, or by visitors driving on roads that were intended to provide only temporary access for logging or

maintenance projects.  (Resp. to Statement of Undisputed Facts, ECF 39 ¶ 80.)  The Forest Service did

---

[1] The administrative record has been lodged with the court.  (ECF 20, ECF 37.)

1   not approve the creation of these roads and trails and they were not subject to environmental analysis or

2   public participation before their use began.  (*Id.*)

3          In 1972, then-President Nixon adopted an Executive Order that recognized the need to

4   address the use of OHVs in National Forests and other public lands, as OHVs were "in frequent conflict

5   with wise land and resource management practices, environmental values, and other types of

6   recreational activity."  The Order was amended by further order in 1977.  Exec. Order No. 11644, 37

7   Fed. Reg. 2,877 (Feb. 9, 1972), *as amended by* Exec. Order 11989, 42 Fed. Reg. 26959 (May 25, 1977).

8   The Executive Orders direct heads of agencies that manage federal lands to develop regulations to

9   manage OHV use in a way that "protect[s] resource values, preserv[es] public health, safety, and

10  welfare, and minimize[s] use conflicts," as well as minimizing damage to the environment.  *Id.*  The

11  Forest Service's Travel Management Rule ("TMR") implementing the Executive Orders is found at 36

12  C.F.R. § 212.1, *et. seq.*

13      B.  The Stanislaus Motorized Travel Management Decision

14          To comply with the TMR, the Forest Service has attempted to regulate the use of OHVs

15  in National Forests, including the Stanislaus.  In 1998, the Forest Service approved a Motor Vehicle

16  Travel Management Plan that limited OHV travel in the Stanislaus to roads and trails designated for

17  motorized use.  (ECF 1 ¶ 39; Answer, ECF 10 ¶ 39.)  Despite this limitation, unauthorized OHV use

18  continued.  (*Id.*)  In 2002, the Forest Service created a comprehensive map and database of the NFTS

19  within the Stanislaus.  (ECF 39 ¶ 79.)  In 2006, the Forest Service also completed a database of

20  unauthorized routes, in partnership with the State of California, identifying between 230 and 270 miles

21  of user-created trails in the Stanislaus.[2]  (*Id.* ¶ 82.)

22          Beginning in 2005, the Forest Service started the process known as the Stanislaus

23  Motorized Travel Management Decision ("SMTMD") to manage continued unauthorized motorized use

24  of the Stanislaus and designate routes for permitted motorized vehicle use.  (*Id.* ¶¶ 83, 86.)  The Forest

25

26          [2] The parties dispute the number of miles of unauthorized roads identified in the survey.
    According to the Forest Service, the inventory revealed approximately 230 miles of unauthorized trails.

27  (ECF 39 ¶ 82.)  Plaintiffs assert that this figure is consistent with the EIS, but that the ROD states that
    there are 246 miles of unauthorized routes and that the Notice of Intent described below states that there

28  are approximately 270 miles of unauthorized routes. (*Id.*)

3

Service conducted public outreach between 2005 and 2007, seeking input from both motorized and non-motorized users.  (*Id.* ¶¶ 83-85.)  The Forest Service was required to comply with the National Environmental Protection Act ("NEPA") throughout the process.  In November 2007, the Forest Service began the formal NEPA process by sending a scoping letter to interested parties.  (*Id.* ¶ 86.)  During the scoping process, an agency determines "the range of actions, alternatives, and impacts to be considered in an environmental impact statement."  40 C.F.R. § 1508.25.  Additionally, the Stanislaus Forest Supervisor published a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") as required by NEPA, requesting public comment on the Forest Service proposal.  (ECF 39 ¶ 86.)  During the scoping period, the Forest Service received hundreds of comments and letters from the public providing diverse perspectives on the extent to which motorized travel in the Stanislaus should continue.  (*Id.* ¶ 88.)  On February 27, 2009, the Forest Service released the Motorized Travel Management Draft EIS ("DEIS").  (*Id.* ¶ 92.)  The DEIS analyzed the Forest Service's proposed action for modifying the NFTS in the Stanislaus, as well as four alternative scenarios.  (*Id.*)  The public comment period for the DEIS was open until May 20, 2009.  During this time the Forest Service received 841 letters from 927 parties, including plaintiffs.  (*Id.* ¶¶ 93, 95.)  Based on these comments and additional analysis, the Forest Service made revisions to the DEIS in preparing a final EIS.  (*Id.* ¶ 97.)

On November 12, 2009, the Forest Service released its final EIS and a Record of Decision ("ROD") approving in substantial part the Forest Service's proposed action.  (AR000670.)  Before the SMTMD, there were approximately 2947 miles of NFTS roads and 85 miles of NFTS motorized trails in the Stanislaus, 2279 miles of which were open to public motorized use.  (AR000739.)  The SMTMD made the following changes to the NFTS: (1) it prohibited public motorized travel except on NFTS routes; (2) added 136.77 miles of unauthorized routes to the NFTS as motorized trails; (3) opened to the public 67.37 miles of previously closed NFTS roads; (4) closed 45.98 miles of previously open NFTS roads to the public; (5) changed 93.36 miles of NFTS roads from allowing highway legal vehicles only to allowing all vehicles; and (6) changed 400.56 miles of roads from allowing all vehicles to allowing highway legal vehicles only.  (AR000649-AR00050.)

C.  The Present Action

On August 8, 2010, plaintiffs Central Sierra Environmental Resource Center ("CSERC"), The Wilderness Society ("TWS") and Public Employees for Environmental Responsibility ("PEER") filed this suit against the Forest Service, Susan Skalski, Forest Supervisor for the Stanislaus, and Randy Moore, Regional Forester for U.S. Forest Service, Pacific Southwest Region (collectively, defendants or "Forest Service").  (Compl., ECF 1.)  Plaintiffs' complaint alleges that the Forest Service violated NEPA and the APA by not analyzing a reasonable range of alternatives to the proposed action, by improperly defining the baseline of existing NFTS roads and trails, and by not fully analyzing the impacts of adding additional motorized routes to the NFTS.  (*Id.*).  Additionally, plaintiffs allege that the Forest Service violated 36 C.F.R. § 212.5(b), Executive Orders 11644 and 11989, and the APA by not minimizing adverse impacts to forest resources.  (*Id.*)[3]  Plaintiffs seek both declaratory and injunctive relief.  (*Id.*)

II.   Standing

As a threshold matter, the Forest Service argues that plaintiffs have not demonstrated they have standing to make their claims. (Defs.' Br. at 19,[4] ECF 32.)  As the parties invoking the court's jurisdiction, plaintiffs have the burden to show they have standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). To establish standing, plaintiffs must show they are "under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.*; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In addition, when a plaintiff is an organization suing on behalf of its members, the plaintiff must show that "its members would otherwise have standing to sue in their own right; the interests at stake are germane to the organization's purposes; and

---

[3] Plaintiffs' complaint contains two additional claims that they did not argue in their briefs.  The complaint alleges that the Forest Service did not properly analyze direct and indirect impacts in its NEPA analysis.  (Compl. ¶ 66.)  Plaintiffs also allege that the Forest Service violated the National Forest Management Act, 16 U.S.C. § 604, the Stanislaus Forest Plan created under the Act, and the APA.  (*Id.* ¶ 83.)  At oral argument on November 27, 2012, plaintiffs clarified that they have abandoned these claims.

[4] Citations to the parties' briefs refer to the pagination assigned by the court's electronic filing system.

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). In bringing a motion for summary judgment, the party must "set forth by affidavit or other evidence specific facts" demonstrating that the party meets each element of standing. *Defenders of Wildlife*, 504 U.S. at 561 (internal quotations and citations omitted). A plaintiff in an environmental lawsuit may show injury in fact by demonstrating that the challenged action will harm the plaintiff's aesthetic and environmental interests. *Id*. at 562-63; *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972).

A. Plaintiffs' Affidavits

To demonstrate that they have standing, plaintiffs submitted three affidavits with their motion in support of summary judgment, one from a member of each organization. The first is a declaration from John Buckley, member and Executive Director of CSERC. (ECF 41 ¶ 2.) The declaration explains that the mission of CSERC is to advocate on behalf of the central Sierra Nevada, including the Stanislaus, and to protect it from threats to its environment. *(Id.* ¶¶ 3-4.) Buckley enjoys fishing, hiking, and observing wildlife in the Stanislaus, all activities he claims are impeded by OHV use. (*Id.* ¶¶ 12-15.) The declaration of Darça Morgan, member of PEER, describes PEER's mission as promoting "responsible management of public resources," including a campaign to reduce effects of OHVs. (ECF 27-6 ¶ 2.) Morgan visits and studies wildlife and ecosystems in the Stanislaus in her professional capacity as a conservation biologist for a non-profit organization, and also hikes, bikes, bird watches and camps there for recreation. (*Id.* ¶¶ 4-7.) Morgan states that OHV use impairs her enjoyment of these activities. (*Id.* ¶¶ 8-13.) The third declaration is from Jon Sturtevant, member of TWS. (ECF 27-7 ¶ 2.) TWS "work[s] to ensure the wise management and protection of America's public lands," including the Stanislaus. (*Id.* ¶¶ 2-3.) Sturtevant's declaration describes how OHV use disturbs his hikes in the Stanislaus. (*Id.* ¶¶ 5-7.)

B. Motion to Strike

The Forest Service objects to paragraphs 9 to 11 and 15 to 35 of the Buckley declaration; and paragraph 11, lines 18-19, paragraph 12, lines 22-28, 6-9; paragraph 13, lines 18-19; paragraph 14, lines 20-23; paragraph 15, line 16, and paragraph 16, lines 10-14, of the Morgan declaration. (*See* ECF 35, 40, 46.)

6

In an action under the APA, the court generally may review only the administrative record, 5 U.S.C. § 706(2)(F), but it may consider extra-record evidence that allows plaintiffs to establish standing. *Nw. Envtl. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527-28 (9th Cir. 1997); *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir. 1992). The Forest Service argues that the portions of affidavits to which it objects should be stricken because they are not necessary to show standing. (ECF 46.) The Forest Service objects to parts of the Morgan declaration explaining how OHV use interferes with Morgan's birding activities and visits to the Stanislaus (ECF 27-6 ¶ 11:18-19, ¶ 12:22-28, 6-9), and her concern that the SMTMD will worsen these impacts (*Id.* ¶ 16). These portions are not stricken. Similarly, the court will not strike parts of the Buckley declaration that describe how OHV use, including trails approved through the SMTMD, disturbs Buckley's trips to the Stanislaus, as these are relevant to CSERC's standing. (ECF 41 ¶¶ 15, 29-35, 27:1-6; 11-14.) Morgan's description of experiences and beliefs regarding local Forest Service officials (ECF 27-6 ¶ 15) is not relevant to PEER's standing and is stricken. Additionally, the court strikes portions of the declarations describing Buckley's and Morgan's participation in the administrative process and opinions about the Forest Service's decision (ECF 27-6 ¶ 14:20-23; ECF 41 ¶¶ 19-26, 28, 27:7-17), as this information is contained in the administrative record. *See Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996) (upholding the district court's decision to strike evidence already in the administrative record).

C. Analysis

The Forest Service argues that plaintiffs have not met their burden to demonstrate standing because the plaintiffs' affidavits do not adequately identify particular areas that members visit that are affected by the SMTMD. (Defs.' Br. at 20, ECF 32-1.) Environmental groups do not have standing to challenge actions that affect only certain geographical areas when the groups do not set forth facts showing that their members have aesthetic and environmental interests in those particular areas, as opposed to broader areas. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). But the members' declarations in this case list specific roads and trails and areas they plan to visit that will be affected by the SMTMD. (Morgan Decl. ¶¶ 11-14, ECF 27-6; Buckley Decl. ¶¶ 13-15, ECF 41; Sturtevant Decl. ¶¶ 6-7, ECF 27-7.) These details are sufficient to demonstrate the environmental

groups' standing.  Moreover, because the challenged action affects the entire system of roads and trails in the Stanislaus, not just a discrete area, it is likely that plaintiffs' members will come into contact with affected locations while recreating in Stanislaus.  *Cf. Pacific Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1022-23 (9th Cir. 2012) (organization had standing to challenge Forest Service's changes to permitted timber harvesting impacting the entire Sierra, even though member affidavit did not refer to specific affected areas, because large amount of timber harvesting allowed made it likely members' use of the forest would be affected by the challenged action).  In sum, each declaration describes how the interests plaintiffs seek to protect are germane to each organization's purpose, that a member of each organization regularly visits the Stanislaus, and that OHV use negatively impacts each person's enjoyment of the forest.

Intervenors argue that plaintiffs do not meet the redressability requirement of *Defenders of Wildlife*, 504 U.S. at 561, because the SMTMD reduces the total mileage in trails available for OHVs and because the trails the Forest Service approved for OHVs already were accessible to OHVs, even though this is the first time they have been formally approved.  (Intervenors' Br. at 5, ECF 36.)  The court finds that plaintiffs' objections to the SMTMD's designation of specific trails frequented by their members for motorized use are enough to satisfy the redressability requirement, even though the SMTMD may reduce motorized use in other areas of the Stanislaus, as the members' use of those specific trails could be affected by permitting motorized use.  (*See* Pl.'s Opp'n at 10-11, ECF 38.)  Thus, the plaintiffs have established standing.

III.     Substantive Claims

A.  Standard of Review

The court reviews final agency actions under the APA, 5 U.S.C. § 701, *et seq.*  The court does not determine whether there are disputed issues of material fact as it would in a typical summary judgment proceeding; its review is based on the administrative record.  5 U.S.C. § 706(2)(F); *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1472 (9th Cir. 1994); *see also South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010) (usual summary judgment standards do not apply).  The court must consider whether the agency's actions, findings and conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in

8

1   accordance with the law. . . ."  5 U.S.C. § 706(2)(A).  The court's inquiry must be "searching and

2   careful, but the ultimate standard is a narrow one."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360,

3   378 (1989) (internal quotations and citation omitted).  Under this narrow standard, a decision is arbitrary

4   and capricious

5               only if the agency relied on factors Congress did not intend it to consider,
                entirely failed to consider an important aspect of the problem, or offered
6               an explanation that runs counter to the evidence before the agency or is so
                implausible that it could not be ascribed to a difference in view or the
7               product of agency expertise.

8   *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotations and citation

9   omitted).

10      B.  NEPA Claims

11          NEPA requires agencies to take a "hard look at the environmental consequences" of their

12  proposed actions by analyzing their environmental impacts and considering potential alternatives.

13  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)).  NEPA does not require the

14  agencies' decision making process to lead to a particular outcome; it requires agencies to conform to a

15  particular procedure.  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir.

16  2008).  Rather than reviewing whether the agency reached the correct decision, a court "must consider

17  whether the decision was based on a consideration of the relevant factors and whether there has been a

18  clear error of judgment."  *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 865 (9th Cir.

19  2004) (quoting *Marsh*, 490 U.S. at 378).

20          Plaintiffs allege that the Forest Service's Stanislaus Travel EIS violated NEPA in two

21  distinct ways.  First, plaintiffs claim that the Forest Service's analysis of alternatives to the proposed

22  action in the EIS was defective for two reasons:  the Forest Service did not consider an adequate range

23  of alternatives to the proposed action or properly define the baseline of existing conditions against which

24  to measure the alternatives.  Second, plaintiffs claim the Forest Service did not properly analyze the

25  cumulative effects of its actions in the EIS.

26      1.  Consideration of Alternatives

27          The "heart" of a NEPA analysis is the agency's consideration of alternatives to the

28  proposed action.  40 C.F.R. § 1502.14.  The first step the agency must take in its consideration of

alternatives is to "specify the underlying purpose and need" for the proposed action, which is set out in the agency's "Purpose and Need" section of its NEPA analysis. *Id.* § 1502.13; *Westlands Water Dist.*, 376 F.3d at 865. The underlying Purpose and Need "dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms." *Westlands Water Dist.*, 376 F.3d at 865 (internal quotations and citations omitted). NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and explain why potential alternatives excluded from this detailed study were not part of the analysis. 40 C.F.R. § 1502.14(a). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist.*, 376 F.3d at 868 (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir. 1998)). However, "[j]udicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *State of California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (internal quotations and citations omitted). Agencies must also include a "no action" alternative as part of the analysis. 40 C.F.R. § 1502.14(d). The no action alternative "provides a baseline against which the action alternative . . . is evaluated." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (internal citation and quotation omitted).

A reviewing court begins its evaluation of an agency's alternatives analysis by assessing the reasonableness of the agency's Purpose and Need section. *Westlands Water Dist.*, 376 F.3d at 865. Here, the Forest Service identified the Purpose and Need of the project as twofold. First, the Forest Service recognized the "need for regulation of unmanaged wheeled motor vehicle travel by the public," consistent with the goals of the TMR "to prevent resource damage caused by unmanaged motor vehicle use by the public." (AR000741.) Additionally, the Forest Service identified the "need for limited changes to the [NFTS] to: a. Maintain motor vehicle access to dispersed recreation opportunities (camping, hunting, fishing, hiking, horseback riding, etc. [and] b. Provide a diversity of motorized recreation opportunities (4WD, motorcycles, ATVs, passenger vehicles, etc.)." (*Id.*) Plaintiffs do not directly dispute that this statement accurately sets out the agency's obligation to balance motorized access to the Stanislaus with the need to minimize environmental impacts.

Instead, plaintiffs argue that the Forest Service did not analyze an adequate range of alternatives to the proposed action, referred to as the Proposed Alternative.  (Pls.' Br. at 27, ECF 27-1.)  The Proposed Alternative would prohibit travel on unauthorized routes, add 151.64[5] miles of unauthorized routes to the NFTS, open 67.37 miles of previously closed NFTS roads, and close 45.98 miles of previously open NFTS roads to the public.  (AR000754-55.)  In addition to the Proposed Alternative enacted through the SMTMD, the Forest Service's EIS considered four alternatives as part of its detailed analysis.  (AR000754-AR000762.)  The "No Action" Alternative would make no modifications to the NFTS and would not restrict travel on unauthorized routes.  (AR000757.)  The "Cross Country Prohibited" Alternative would prohibit travel on unauthorized routes but make no changes to the NFTS.  (Id.)  The "Recreation" Alternative would make the most routes available for motorized use, closing only 10.66 miles of NFTS trails to public use, opening 101.24 miles of closed NFTS trails to public use, and adding 175.97 miles of unauthorized routes to the NFTS, but prohibiting travel on remaining unauthorized routes (AR000758-AR000759). The "Resources" Alternative would "provid[e] greater protection for forest resources" by prohibiting travel on unauthorized roads, adding only 28.37 miles of unauthorized routes to the NFTS, opening 11.66 miles of closed NFTS roads to public use, and closing 59.03 miles of NFTS roads to public use.  (AR000761-AR000762.)

Plaintiffs argue that the Forest Service's analysis of alternatives was arbitrary and capricious because "none of the alternatives considered in the []EIS would close more than a negligible number of NFTS roads and trails to motor vehicle use" (Pl.'s Br. at 27, ECF 27-1.)  While recognizing that the Forest Service considered a range of alternatives, plaintiffs assert that the Resources Alternative and Proposed Alternative were essentially the same, because the former would only close approximately 13 more miles of NFTS roads than the latter.  Plaintiffs highlight a table in the EIS that "provides a summary of the Purpose and Need details related to the four components of the Proposed Action."  (Pls.' Opp'n at 22, ECF 38; AR000742.)  Under the table heading "Changes to the Existing NFTS," the Forest Service indicates the planned NFTS road closures, explaining that these closures would "protect

---

[5] As described in the EIS, the Proposed Alternative would have added 151.64 miles of unauthorized trails to the NFTS, but 14.86 miles of these trails were dropped in the ROD, meaning that 136.77 miles of unauthorized trails were added to the NFTS through the SMTMD.  (AR000649, AR000754.)

facilities," that they were "not needed for recreation," and that they would "reduce conflicts between different users." (AR000742.)  According to plaintiffs, this table entry demonstrates that closing NFTS roads was an action consistent with the stated Purpose and Need, meaning that a full analysis would require the Forest Service to consider an alternative with more closures.  (Pls.' Opp'n at 22-23, ECF 38.) During the scoping process, plaintiffs presented the Forest Service with an alternative to the Proposed Alternative that would close 205 miles of roads to motorized use and add 26.03 miles of unauthorized routes to the NFTS, but the Forest Service did not include it as part of its in-depth alternatives analysis in the EIS.  (AR000766-AR000767.)

In response, the Forest Service asserts that the range of alternatives it analyzed was appropriate considering its description of Purpose and Need, which focused on managing motorized travel on unauthorized trails and making modifications to the existing NFTS system to facilitate motorized use.  (Defs.' Reply at 11, ECF 45; *cf.* AR000731-AR000732.)  Additionally, the Forest Service claims that while the plaintiffs' proposed alternative would not have met the Purpose and Need of the project, aspects of the plaintiffs' proposed alternative were incorporated into the Resources Alternative.  (*Id.* at 13-14.)

The court finds the Forest Service analyzed a reasonable range of alternatives. An alternative closing more NFTS roads, as plaintiffs proposed, would not have been inconsistent with the Purpose and Need, but this does not mean the Forest Service was obligated to consider such an alternative if it would not have aided the Forest Service in making a "reasoned choice."  *See Block*, 690 F.2d at 767.  There is no requirement that the Forest Service consider every possible alternative. *High Sierra Hikers Ass'n v. U.S. Dep't of Interior*, 848 F. Supp. 2d 1036, 1051 (N.D. Cal. 2012) (citing *Westlands Water Dist.*, 376 F.3d at 871).  Although the Resources Alternative and the Proposed Alternative may not have differed meaningfully in terms of the miles of NFTS roads that would be closed, the two alternatives did vary the numbers of unauthorized routes that would be added to the NFTS, adding 28.37 miles and 151.64 miles respectively.  Because the Purpose and Need of the SMTMD was to manage travel on unauthorized roads, the court is satisfied that the range of alternatives considered by the Forest Service was reasonable.  In *Block*, 690 F.2d at 766-67, which plaintiffs cite in support of their argument, the court held that the Forest Service considered an inadequate range of

alternatives when it allocated millions of National Forest System (NFS) acres among three

classifications defining the level of protection that each category would receive, as no alternative would

have put more than one-third of the roadless areas in the category providing the highest level of

protection.  Unlike in that case, plaintiffs have not shown here that the range of alternatives the Forest

Service considered was unreasonably narrow in the context of the stated Purpose and Need.

2.   Definition of Baseline Conditions

Plaintiffs' second argument regarding the alternatives analysis is that it was flawed

because the Forest Service did not accurately define the "baseline" of existing NFTS roads and trails that

were available for public use, making it impossible for the analysis to evaluate accurately the effect of

modifying the NFTS.  (Pls.' Br. at 23-24, ECF 27-1.)  According to plaintiffs, the Forest Service needed

to show that the entire 2,279 miles of NFTS routes that it considered during preparation of the Stanislaus

Travel Plan EIS had been previously reviewed during a NEPA process and that no roads or trails had

become part of the system by unauthorized OHV use or unplanned use of old logging roads.  (*Id.* at 24.)

Otherwise, plaintiffs explain, some parts of the NFTS would be made available for public use despite a

lack of analysis of their environmental impacts.  (*Id.*)  Plaintiffs cite no authority for the proposition that

demonstrating current compliance with NEPA requires the Forest Service to demonstrate prior

compliance with NEPA for pre-existing conditions.  *See Klamath-Siskiyou Wildlands Ctr. v. Graham*,

No. 2:11-cv-004390-MCE-JFM, 2012 WL 4510789, at *15 (E.D. Cal. Sept. 28, 2012) (Forest Service

was not obligated to show that existing NFTS trails were adopted after NEPA review before making

modifications to the NFTS).

The court may determine that the Forest Service's alternatives analysis is flawed,

however, if the Forest Service improperly defined the Stanislaus NFTS system as it existed before the

SMTMD, as the baseline of existing conditions defines the No Action Alternative.  *See Ctr. for

Biological Diversity*, 623 F.3d at 642; *see also Friends of Yosemite Valley v. Kempthorne*, 520 F.3d

1024, 1038 (9th Cir. 2008) (holding an agency's no-action alternative in its NEPA analysis invalid

because it improperly defined the baseline).  If the Forest Service included routes that were never

formally adopted as part of the NFTS system in the No Action Alternative, the analysis of the effect of

the other alternatives on the baseline conditions might be inaccurate.

13

1    Even so, as discussed below, plaintiffs have not presented persuasive evidence that any

2    routes considered part of the NFTS system in the No Action Alternative were not adopted without

3    NEPA review, or that the definition of the baseline was otherwise flawed.  Agencies' decision-making

4    processes are entitled to a presumption of regularity.  *Citizens to Preserve Overton Park, Inc. v. Volpe*,

5    401 U.S. 402, 415 (1971); *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000).

6    On the record before it, because there is no evidence indicating otherwise, the court accepts the agency's

7    assertion that the No Action Alternative accurately depicted the NFTS system as it existed before the

8    SMTMD.

9    No portion of the administrative record shows the Forest Service did not meet its

10   obligations under NEPA in developing the NFTS system.  Plaintiffs point to U.S. Environmental

11   Protection Agency comments submitted during the scoping period recommending that the Forest Service

12   in the DEIS "clearly define the baseline and No Action alternative.  For instance, describe the NEPA

13   documentation or decision documents supporting the identification of roads as part of the current

14   transportation system." (AR Doc. 3-08.)  However, EPA's suggestion does not impose an obligation on

15   the Forest Service, nor have plaintiffs shown that the EPA ever objected to the Forest Service's

16   description of the baseline NFTS in the DEIS.  The EPA's comment during the scoping period is not

17   enough to show that the Forest Service's alternatives analysis is flawed.  *Cf. Cal. Trout v. Schaefer*, 58

18   F.3d 469, 475 (9th Cir. 1995) (other agencies' concerns regarding U.S. Army Corps' environmental

19   assessment insufficient to show NEPA violation, as Corps responded to concerns and there was no

20   significant disagreement between the agencies).

21   Plaintiffs reference a table in the administrative record that lists each road and trail in the

22   Stanislaus with notations, whether each is already part of the NFTS or is being considered for addition.

23   (Pls.' Reply at 27, ECF 38, citing AR Doc. 5-28.)  A column next to the name of each road or trail, titled

24   "NEPA DONE," contains either a "YES" or "NO."  (*Id.*)  Plaintiffs argue that those trails considered

25   part of the existing NFTS system that have a "NO" next to their names on the spreadsheet never

26   underwent a NEPA review.  (*Id.*)

27   The Forest Service seeks to rely on the declaration of Sue Warren (the "Warren

28   declaration") as extra-record material to explain the table plaintiffs reference; plaintiffs oppose admitting

14

the declaration.  (ECF 47; ECF 48; ECF 50.)  Under the APA, the court's review of agency decisions is confined to "the whole record or those parts of it cited by a party."  5 U.S.C. § 706(2)(F); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The Ninth Circuit has recognized four narrow exceptions where the court may review extra-record material.  *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).  The court may review the material if:

> (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*Id.*  The Forest Service argues that the Warren declaration falls within the first and third exceptions.  (*See* ECF 48 at 3-4.)  The court agrees.  Without the Warren declaration, the court is unable to interpret the table and determine whether the table indicates the Forest Service included routes that were never formally adopted into the NFTS system as part of the No Action Alternative.  Warren is qualified by virtue of her position as Interdisciplinary Team Leader for the EIS and ROD at issue here.  (ECF 47 ¶ 2.)

The Warren declaration explains that a "NO" in the NEPA column does not mean there was no NEPA analysis conducted for a particular trail.  (ECF 47 ¶ 4.)  Rather, it means the Forest Service team preparing the spreadsheet had not located documentation of a NEPA analysis for that trail.  (*Id.*)  As the team did not conduct an "exhaustive search," a lack of documentation does not mean a NEPA analysis was never conducted.  (*Id.*)  In this light, as limited an explanation as the Warren declaration provides, there is no clear evidence that the Forest Service did not correctly define the baseline reflected in the No Action Alternative.

      3.   Cumulative Effects Analysis

As part of its assessment of environmental impacts of an agency action, a proper NEPA analysis must include an analysis of the action's cumulative impact.  *City of Carmel v. Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997) (citing 40 C.F.R. § 1502.16).  NEPA regulations define cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

Plaintiffs claim the Forest Service did not adequately analyze the cumulative impacts of the SMTMD in the EIS. (Pls.' Br. at 31, ECF 27-1.) Specifically, plaintiffs allege that the Forest Service did not sufficiently review cumulative impacts on roadless areas, those managed under the Forest Service's roadless rule, 36 C.F.R. § 294.1, or on Wild and Scenic Rivers ("WSRs"), which are rivers designated under the Wild and Scenic Rivers Act, 16 U.S.C. § 1271, *et seq.* (*Id.* at 31-34.) In the EIS itself, the Forest Service states that the action approved in the ROD will have no cumulative impacts on either roadless areas or WSRs. (AR000875, AR000901.) Plaintiffs argue the Forest Service should have considered how the new routes would combine with existing roads and other activities to intensify environmental impacts. (Pls.' Br. at 32-35, ECF 27-1.)

The Forest Service argues that plaintiffs did not exhaust their administrative remedies regarding the cumulative impacts issues, and therefore may not now claim that the Forest Service's cumulative impacts analysis was defective. (Defs.' Br. at 29, ECR 32-1.) Plaintiffs must exhaust administrative remedies before filing an action against the Forest Service in District Court. 5 U.S.C. § 704; 7 U.S.C. § 6912(e). To exhaust administrative remedies, "[c]laims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and . . . . exhaustion arguments [are considered] on a case-by-case basis." *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). The plaintiff need not have referenced the particular regulation or statute on which it relies during the administrative process. *Id.* (citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002)).

Plaintiffs point to several places in the administrative record where they claim to have raised the cumulative effects arguments sufficiently to alert the Forest Service to those issues. (Pls.' Opp'n at 31-32, ECF 38.) In a comment on the DEIS submitted to the Forest Service by two plaintiffs, TWS and PEER, along with two other organizations, the commenters remarked that the DEIS acknowledged no environmental impacts on roadless areas from the Proposed Alternative, except to say that increased motorized traffic would "reduce[] opportunities for solitude in nearby areas." (AR Doc.

16

3-08 at 51-52.)  Additionally, the commenters recommended that the Forest Service not approve OHV

routes or reopen closed routes in roadless areas or near WSRs because it would create conflicts between

motorized and other visitors.  (*Id.* at 55.)  Another comment by plaintiff CSERC asked the Forest

Service not to approve a particular route for motorized use because it would degrade a WSR, and to not

allow additional motorized activity in roadless areas because of conflicts with other users of these areas.

(AR Doc. 3-10 at 16-17.)  Similar arguments are made in TWS's appeal to the Forest Service of the

ROD.  (AR Doc. 1-19 at 56-60 (arguing Forest Service did not adequately analyze environmental

impacts that routes for motorized vehicles would have on roadless areas)).)  At first glance, these

comments appear sufficient only to notify the Forest Service that plaintiffs believed generally that more

analysis of environmental effects on roadless areas and WSRs was needed, but not that plaintiffs wished

to challenge the Forest Service's analysis of cumulative impacts specifically.  The comments do not use

the term "cumulative effects," nor do they discuss the specific environmental impacts that plaintiffs now

argue were improperly excluded from the cumulative effects analysis.

However, the Forest Service's response to summarized comments, published in the EIS,

indicates the Forest Service did understand that plaintiffs and other commenters objected to the

cumulative effects analysis regarding roadless areas.  In the EIS, the Forest Service responded to a

comment it summarized as stating: "The Travel Management EIS fails to meet the standards of

analyzing cumulative effects.  In particular, the EIS must include discussion of the connection between

individual projects, or past recommendations given to the public about where to ride OHVs and the prior

environmental harms from those activities."  (AR001303.)  In response to another comment summary,

the Forest Service asserted, "[t]he analysis presented in [the chapter of the EIS addressing roadless

areas] discloses the effects of the alternatives . . . including full disclosure of . . . cumulative effects."

(AR001359.)

The Forest Service's identification of and response to the cumulative effects issue

demonstrates that it had sufficient notice of the issue from comments to the DEIS to be able to

understand and respond to plaintiffs' objections about impacts on roadless areas.  *See Native Ecosystems*

*Council*, 304 F.3d at 899-900 (administrative decision maker's discussion in administrative record of

plaintiffs' objections indicated plaintiffs had exhausted administrative remedies).  The Forest Service

17

did not reference WSRs in its response to comments in the EIS, however.  The court finds that plaintiffs exhausted their administrative remedies as to their objections to the Forest Service's analysis of cumulative effects on roadless areas but not as to WSRs.  The court therefore has jurisdiction to review the Forest Service's analysis of cumulative impacts on roadless areas.

The court next considers whether plaintiffs have shown that the Forest Service's analysis of the cumulative effects on roadless areas was deficient.  The Forest Service argues its conclusion that there would be no significant cumulative effects, as stated in the EIS, was reasonable.  (Defs.' Br. at 33-34, ECF 32-1.)  It explains that there are only 26.23 miles of trails open to public motorized use within 131,100 total acres of roadless areas.  (*Id.* at 32.)  While the SMTMD adds several miles of unauthorized routes to the NFTS in roadless areas, the overall effect of the SMTMD is to reduce the miles of roads and trails available for motorized use in roadless areas, including reducing the miles of routes available for OHVs.  (*Id.*)  As the description in the EIS of baseline conditions in roadless areas includes the effects of motorized use prior to the SMTMD, the alternatives analysis necessarily incorporates the combined effects of this past motorized activity with the proposed changes in motorized activity.  (*Id.*)

It was not unreasonable for the Forest Service to conclude that its proposed changes to the NFTS in roadless areas would not result in negative cumulative impacts in the Stanislaus.  The court in *Idaho Conservation League*, 766 F. Supp. 2d 1056, 1065-66 (D. Idaho 2011), rejected a similar challenge to the Forest Service's analysis of cumulative effects of changes to the NFTS.  As with the SMTMD, the Forest Service's action in *Idaho Conservation League* reduced the number of miles of routes available for motorized access, while designating a smaller number of previously unauthorized routes for motorized use.  *Id.* at 1065.  Because the action led to net fewer routes available for motorized travel, it was reasonable for the Forest Service to determine there would be no cumulative impacts.  *Id.*; *see also Klamath-Siskiyou Wildlands Ctr.*, 2012 WL 4510789, at *11-12 (Forest Service's conclusion that decision reducing motorized vehicle use in Klamath National Forest would not result in cumulative impacts was not arbitrary or capricious).  Likewise here, it was reasonable for the Forest Service to determine that reducing the overall miles available for motorized use would not cause negative cumulative impacts.  The Forest Service's analysis of cumulative effects in the EIS was not arbitrary and capricious.

18

C.  Failure to Minimize Impacts under the TMR and Executive Orders

Plaintiffs allege that the Forest Service violated the TMR and Executive Orders 11644 and 11989 because it did not meet its obligation to minimize environmental impacts in adopting the ROD and EIS.  (Pls.' Br. at 16, ECF 27-1.)  The Forest Service argues that the Executive Orders do not create a right of action enforceable by private parties.  (Defs.' Br. at 35, ECF 32-1.)  Plaintiffs concede that even if the Executive Orders are independently enforceable, they do not impose obligations separate from those in the TMR.  The court thus does not reach the question of whether the Executive Orders create a private right of action.

Subpart B of the TMR requires that, in designating NFTS trails and areas, the Forest Service

> consider effects on the following, with the objective of minimizing:
> (1) Damage to soil, watershed, vegetation, and other forest resources;
> (2) Harassment of wildlife and significant disruption of wildlife habitats;
> (3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands. . . .

36 C.F.R. § 212.55(b).  The Forest Service's interpretation of Subpart B is entitled to deference, unless it is "plainly erroneous or inconsistent with the regulation."  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal citations omitted).

Plaintiffs claim that the language of Subpart B demonstrates the Forest Service may not "simply . . . 'consider' minimizing damage to forest resources; the Forest Service must have the objective of actually minimizing that damage."  (Pls.' Br. at 18, ECF 27-1.)  The Forest Service counters that when the language of Subpart B is read within the context of the entire TMR, it is clear it "leaves . . . to the Agency's discretion to decide on a case-by-case basis how to balance minimization of damage with the need for recreation access."  (Defs.' Br. at 40, ECF 32-1 (emphasis omitted).)  In other words, the parties agree that the Forest Service must consider both the need for recreation access and the need to minimize environmental damage, but disagree whether having an "objective" to minimize environmental damage means that the Forest Service must take affirmative steps to do so.

At the same time, the parties agree that Subpart B does not require the Forest Service to eliminate environmental damage entirely.  (*Id.*; Pls.' Opp'n at 10-11, ECF 38.)  Requiring the Forest Service to completely remove impacts from motor vehicles would mean that the Forest Service would

need to completely ban motor vehicle use.  This would be inconsistent with the Forest Service's

mandate to manage competing uses of the Stanislaus.  Travel Management: Designated Routes and

Areas for Motor Vehicle Use, 70 Fed. Reg. 68264, 68281 (Nov. 9, 2005).

Several other district courts have considered the Forest Service's obligations to minimize

effects under Subpart B.  Most have concluded that the Forest Service must actually explain how it

aimed to minimize environmental damage in designating routes, though no specific outcome is required.

*Minn. Ctr. for Envtl. Advocacy v. U.S. Forest Serv.,* CIV. 10-2178 SRN/LIB, 2012 WL 1231759, at *22

(D. Minn. Apr. 12, 2012); *Ctr. for Sierra Nev. Conservation v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138,

1146 (E.D. Cal. 2011); *Idaho Conservation League*, 766 F. Supp. 2d at 1072-74.  *But see Pryors Coal.*

*v. Weldon*, 803 F. Supp. 2d 1184, 1195 (D. Mont. 2011) (the minimization language "does not mandate

action.  Rather, it is intended to lend guidance and maintain the regulation's objectives.").  According to

the court in *Minnesota Center for Environmental Advocacy*,

> The regulation does not mandate that agency action minimize the
> particular negative outcomes; it mandates that the agency "consider" the
> effects of agency action, "with the objective of minimizing" certain
> negative outcomes. Thus, the minimization criteria do impose a mandate
> of sorts, but not one that mandates particular measurable results.

2012 WL 1231759, at *22.  The court in *Idaho Conservation League* explained that, in its view, the

"outcome is the same, whether the language directs that the agency 'minimize' the impacts or consider

the impacts 'with the objective of minimizing.'  The language 'with the objective of minimizing' means

that the whole goal or purpose of the exercise is to select routes in order to minimize impacts in light of

the agency's other duties."  766 F. Supp. at 1074.

This court reads the language of Subpart B as imposing an affirmative obligation on the

Forest Service to actually show that it aimed to minimize environmental damage when designating trails

and areas.  While the final outcome of the Forest Service's designation process may not necessarily

minimize environmental damage to the greatest extent possible, the Forest Service must show that it

satisfies the objective of minimizing environmental impacts.  This means the Forest Service must do

more than merely consider those impacts.

Although this reading of Subpart B is not inconsistent with the position asserted by the

Forest Service in its briefs, plaintiffs claim that a review of the record demonstrates the Forest Service

20

did not actually apply the minimization criteria in the SMTMD ROD.  Plaintiffs assert that the Forest

Service's actions are therefore arbitrary and capricious.  (Pls.' Br. at 19, ECF 27-1.)  Specifically,

plaintiffs argue that the Forest Service approved OHV routes that do not minimize impacts on the

environment and wildlife, or that the ROD does not adequately explain how the Forest Service's choice

of OHV routes minimized impacts.  (*Id*.)

        The Forest Service explains the process it used to designate trails and areas under Subpart

B while applying the minimization criteria.  The analysis appears to mirror the Forest Service's NEPA

analysis.  First, the Forest Service identified four alternative systems of routes and trails that "might

satisfy the purpose and need and minimization criteria," as well as the No Action Alternative.  (Defs.'

Br. at 43, ECF 32-1.)  Next, the Forest Service analyzed the environmental impacts of each alternative,

including the impacts of each individual route and trail.  (*Id*.)

        As evidence of the requisite application of the minimization criteria, the Forest Service

points to several tables in the EIS.  (*Id*.)  The first table lists all unauthorized routes that were considered

as additions to the NFTS.  (AR001243-52.)  It summarizes reviews by Forest Service resource

specialists in botany, cultural resources, geology, recreation, soil, water, wildlife and fish "at a level

sufficient to support their effects analysis and identify any necessary site-specific mitigation" for each of

the routes.  (*See* AR001243.)  The second table lists factors for all additions and changes to the NFTS

that the Forest Service considered as part of one or more action alternative including any

"mitigations/requirements" that would be needed for each route.  (AR001253-97.)  The application of

the minimization criteria is also discussed in the ROD.  (AR000665-AR000667.)  The ROD asserts that

the TMR "require[s] consideration of certain criteria when designating routes for motor vehicle use . . ."

(AR000649.)  The ROD then specifies how each criterion listed in the TMR was included in the

decision.  (AR000649-AR000651.)  For example, regarding minimization of harassment to wildlife and

1   damage to wildlife habitat:

2             For all threatened, endangered or sensitive species, it was determined that .
3             . . [the] Proposed Action[] would not result in a trend towards federal
          listing or a loss of population viability.  A forestwide Season of Use
4             approach minimizes disturbance of these species and the possibilities of
          harassment from motor vehicle use.  The evaluations determined that no
5             additions to the NFTS would contribute to habitat loss.

6   (AR00666.)  The ROD also includes similar statements asserting that the Forest Service applied the

7   other minimization criteria from Subpart B of the TMR.  For each criterion, the ROD references the

8   relevant chapter of the EIS.  The ROD further asserts that all mitigation measures the Forest Service

9   believed to be necessary were implemented before any trail would be available for public motorized use

10  and that "all practicable means to avoid or minimize environmental harm" were taken.  (AR000651.)

11           Plaintiffs argue that the Forest Service did not show how the SMTMD minimized

12  environmental damage in designating trails.  (Pls.' Br. at 19, ECF 27-1.)  Additionally, plaintiffs

13  highlight portions of the record they assert demonstrate the Forest Service did not minimize

14  environmental damage.  A February 2009 Forest Service memorandum lists assessments of routes

15  proposed in the DEIS, depicting whether trails are in need of repair (red), in good condition (green), or

16  "may need a little work now to return it to a green condition" (yellow).  (AR004192.)  Plaintiffs assert a

17  review of the ROD shows that 27 trails in the yellow or red category were added to the NFTS without

18  any mitigation.  (Pls.' Br. at 20, ECF 27-1.)  Although the Forest Service does not deny that trails in the

19  red category were adopted in the ROD, it claims that any necessary mitigation measures for routes

20  added to the NFTS also were included in the ROD.  (Defs.' Br. at 47, ECF 32-1.)

21           Plaintiffs also state that the ROD "approved numerous OHV routes that plaintiffs' field

22  reports and other evidence demonstrate are causing substantial environmental harm."  (Pls.' Br. at 20,

23  ECF 27-1.)  Plaintiffs claim that at least one resource specialist evaluating routes proposed for the NFTS

24  had determined in the DEIS that some of the routes' effects could not be mitigated and so those routes

25  were not recommended by the specialist for inclusion.  (*Id*. at 21-22.)  Therefore, the fact that several of

26  these routes were approved in the ROD shows the Forest Service did not apply the minimization criteria.

27  (*See id*.)  In response, the Forest Service only asserts that the resource specialists changed their

28
                                          22

1   evaluations of those routes between the time the DEIS was issued and the EIS was published.  (Defs.'

2   Br. at 48, ECF 32-1.)

3   　　　　　In the face of plaintiffs' challenges, the Forest Service has not made the required showing

4   that it minimized environmental impacts as required by the TMR.  The Forest Service asserts that the

5   analysis contained in the EIS is "perfectly suited to providing the information the [Forest Service]

6   decision-maker needs to determine whether her decision meets the travel management criteria" (Defs.'

7   Reply at 25, ECF 45), but the court is unpersuaded.  Unlike NEPA, which requires agencies to assess

8   environmental consequences of their decisions but does not obligate agencies to take actions that

9   minimize those consequences, the TMR requires the Forest Service to aim to minimize environmental

10  damage when designating routes.  The Forest Service has not explained how satisfying the procedural

11  requirements of NEPA through the EIS analysis meets the substantive requirements of Subpart B of the

12  TMR, nor pointed to any specific parts of the EIS that sufficiently demonstrate its application of the

13  minimization criteria.

14  　　　　　Contrary to the Forest Service's arguments, this is not an instance in which the court must

15  defer to the Service's technical expertise in analyzing the best way to minimize environmental damage

16  in designating routes.  (*See* Defs.' Br. at 46.)  The cases the Forest Service references reflect ample

17  analysis to support the affected agencies' technical determinations.  *See Hells Canyon Alliance v. U.S.*

18  *Forest Serv.*, 227 F.3d 1170, 1184-85 (9th Cir. 2000); *Greenpeace Action v. Franklin*, 14 F.3d 1324,

19  1333 (9th Cir. 1992).  Here, in contrast, the Forest Service has not demonstrated sufficient application of

20  the minimization criteria at all.

21  　　　　　The court in *Idaho Conservation League* rejected a similar showing by the Forest Service

22  in that case, as here, as not meeting the obligation to minimize impacts.  766 F. Supp. at 1072.  There,

23  the Forest Service had created matrices showing the criteria used to make route designations, which

24  were similar to the TMR minimization criteria, but there was no evidence that this information was used

25  in the decision-making process.  *Id*. at 1071-73.  Similarly, the Forest Service here has not demonstrated

26  the link between the Forest Service's assessments of the mitigation required for each trail considered for

27  the SMTMD and any analysis showing the Forest Service actually used this data to minimize

28  environmental impacts.  The conclusory statements in the ROD are not enough to show that the Forest

Service met its obligation to aim to minimize impacts. *See id.* at 1073. On this record, therefore, the Forest Service's action in applying the TMR was arbitrary and capricious.

IT IS THEREFORE ORDERED that:

1. Plaintiffs' motion for summary judgment on its claims that the Forest Service violated NEPA based on its analysis of alternatives and cumulative effects is denied and Defendants' and Defendant-Intervenors' motions for summary judgment on these claims are granted.

2. Plaintiffs' motion for summary judgment on its claim that the Forest Service violated the TMR is granted and Defendants' and Defendant-Intervenors' motions for summary judgment on this claim are denied.

3. The parties are ordered to prepare additional briefing on the appropriate remedy for the Forest Service's violation of the TMR in preparation for a hearing set for February 15, 2012. The parties shall comply with the court's regular briefing schedule and limit the length of their briefs to ten pages each.

DATED:   January 3, 2013.

_____
UNITED STATES DISTRICT JUDGE